**FEDERAL DEPOSIT INSURANCE CORPORATION**

v.

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND.**

Civ. A. No. 87-319-B.

United States District Court, M.D. Louisiana.

July 6, 1993.

See also 118 F.R.D. 435.

David S. Bell, Bell, Cooper & Hyman, Baton Rouge, LA, for F & D Co. of Maryland.

Michael O. Hesse, St. Francisville, LA, for Steve Moncrieff and Tony Thomson.

David Edward Stanley, Stanley & Harrison, Baton Rouge, LA, for Andrea Leclerg Oestman.

William Hardy Patrick, III, Baton Rouge, LA, for Guy Bellelo.

Loretta Lustig, pro se.

Patrick D. Breeden, New Orleans, LA, for Loretta Lustig.

Brian Gabriel Comeaux, Lafayette, LA, for Thomas P. Keene.

POLOZOLA, District Judge.

Capital Bank & Trust Company (Capital Bank) originally filed this suit against Fidelity and Deposit Company of Maryland (F & D) to recover for loan losses under a Bankers Blanket Bond (Bond) issued by F & D. After Capital Bank was closed, the Federal Deposit Insurance Corporation (FDIC) was appointed as receiver for Capital Bank and succeeded Capital Bank as the plaintiff in this case.

This case was tried to a jury for almost three weeks. The jury, after deliberating one week, returned the following verdict in favor of the FDIC:[1]

(a) On the Allie Ray Pogue loans, the jury found liability on 17 loans totalling $5.3 million.[2]

(b) On the Gulfport/Belello loan, the jury found Capital Bank disbursed funds in good faith reliance on the Belello ordinance and had physical possession of the ordinance at the time of the loan.[3]

After the verdicts were entered, the parties timely filed the following motions:

Victor L. Roy, III, Roy, Kiesel, Aaron & Tucker, Baton Rouge, LA, for Capital Bank & Trust Co.

[1.] The Court submitted separate verdict forms to the jury on each of the 27 Allie Ray Pogue loans and the Gulfport/Belello loan. Each verdict form on the Pogue loans contained four questions. The verdict form on the Gulfport/Belello loan contained two questions. Sample verdict forms for the Pogue loans and the Gulfport/Belello loan are attached as Appendix A.

[2.] The Bond limits F & D's liability to $4 million.

[3.] The amount of the Gulfport/Belello loan is $1,469,150.00. The parties reserved to the Court the decision of whether there was coverage for the loan under the Bond.

(1) Plaintiff's request for prejudgment and postjudgment interest;

(2) Motion to allocate collateral and loan payments; and

(3) Defendant's motion to exclude coverage on the Gulfport/Belello loan.

Each of these motions will be discussed separately by the Court.

## I. PLAINTIFF'S MOTION FOR AWARD OF PREJUDGMENT AND POSTJUDGMENT INTEREST

The FDIC seeks both prejudgment and postjudgment interest. Specifically, the FDIC seeks prejudgment interest from the date of judicial demand to the date of the judgment. The FDIC also seeks postjudgment interest on the full amount of the damages awarded by the jury plus prejudgment interest, from the date of entry of judgment until the judgment is paid in full.

F & D opposes plaintiff's motion for award of prejudgment interest from the date of judicial demand. F & D contends that prejudgment interest begins to accrue 60 days from the time that F & D received a sworn proof of loss with full particulars from Capital Bank. F & D also opposes plaintiff's request for postjudgment interest calculated on the principal amount of the judgment plus the amount of prejudgment interest.

### A. *Prejudgment Interest*

 Since this action was brought pursuant to the Court's diversity jurisdiction, state law governs the issue of prejudgment interest.[4] Under Louisiana law, prejudgment interest begins to accrue from the date of judicial demand, regardless of whether the damages are unliquidated, disputed, or not ascertainable until judgment.[5] Therefore, plaintiff is entitled to recover prejudgment interest from the date of judicial demand to the date of entry of judgment.[6]

### B. *Postjudgment Interest*

 Postjudgment interest on money judgments which are awarded in a federal district court is governed by 28 U.S.C. § 1961(a).[7] It is clear that § 1961(a) applies in diversity cases.[8] Therefore, plaintiff is entitled to recover postjudgment interest from the date of entry of judgment until the judgment is paid on the entire amount of the final judgment, including damages and prejudgment interest.[9]

## II. MOTION TO ALLOCATE COLLATERAL AND LOAN PAYMENTS

The jury awarded judgment in favor of the FDIC in the amount of $5.3 million for certain loan losses sustained by Capital Bank. The Bond issued by F & D to Capital Bank contains maximum policy limits of $4 million. The parties now seek a determination of the proper allocation of collateral, now held by the FDIC, which secures various loans and the proper allocation of loan payments made to the FDIC after the discovery of the loss.

---

**4.** *Canal Ins. Co. v. First Gen. Ins. Co.,* 901 F.2d 45 (5th Cir.1990).

**5.** *Cotton Bros. Baking Co. v. Industrial Risk Insurers,* 941 F.2d 380, 391–92 (5th Cir.1991); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Circle, Inc.,* 915 F.2d 986, 992 (5th Cir.1990); *Trans–Global Alloy Ltd. v. First Nat. Bank of Jefferson Parish,* 583 So.2d 443, 457–59 (La. 1991); *Mini Togs Products, Inc. v. Wallace,* 513 So.2d 867, 872–75 (La.App. 2d Cir.1987). See also, La.Civ.Code arts. 1989, 1991, 2000.

**6.** The suit on the Pogue loans was filed on April 29, 1987. The suit on the Belello/Gulfport loan was filed on December 2, 1988.

**7.** 28 U.S.C. § 1961(a) provides in pertinent part:
Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment. . . .

**8.** *Brown v. Petrolite Corp.,* 965 F.2d 38, 51 (5th Cir.1992); *Fuchs v. Lifetime Doors, Inc.,* 939 F.2d 1275, 1280 (5th Cir.1991); *Chapman & Cole v. Itel Container Int'l B.V.,* 865 F.2d 676, 689–90 (5th Cir.1989); *Nissho–Iwai Co., Ltd. v. Occidental Crude Sales, Inc.,* 848 F.2d 613, 622 (5th Cir.1988).

**9.** 28 U.S.C. § 1961(a); *Fuchs,* 939 F.2d at 1280.

Section 7 of the Bond, which pertains to "assignment-subrogation-recovery-cooperation," provides in pertinent part:

(a) In the event of payment under this bond, the Insured shall deliver, if so required by the Underwriter, an assignment of such of the Insured's rights, title and interest and causes of action as it has against any person or entity to the extent of the loss payment.

(b) In the event of payment under this bond, the Underwriter shall be subrogated to the Insured's rights of recovery therefor against any person or entity to the extent of such payment.

(c) Recoveries, whether effected by the Underwriter or by the Insured, shall be applied net of the expense of such recovery first to the satisfaction of the Insured's loss in excess of the amount paid under this bond, secondly, to the Underwriter as reimbursement of amounts paid in settlement of the Insured's claim, and thirdly, to the Insured in satisfaction of any Deductible Amount. . . .

(e) The Insured shall execute all papers and render assistance to secure the Underwriter the rights and causes of action provided for herein. The Insured shall do nothing after discovery of loss to prejudice such rights or causes of action.[10]

### A. *Collateral*

■ The FDIC holds security on many of the loans for which the jury found coverage under the Bond. The FDIC contends that F & D is entitled to obtain the FDIC's rights in the security only after F & D has paid the verdict. In response to the FDIC's contention, F & D contends that it should be given credit for the estimated value of the security which would reduce the amount of the damages it owes to the FDIC.

Sections 7(a) and (b) clearly provide that the underwriter is entitled to the Insured's rights of recovery by assignment or subrogation against any person or entity to the ex-

tent of payment after F & D makes payment under the Bond. Therefore, F & D is entitled to the rights which FDIC has in the security, loans, or claims only after it pays the judgment.[11] F & D is not entitled to a credit or reduction of the jury verdict by the estimated value of the security.

If F & D chooses to take advantage of its rights under sections 7(a) and (b), F & D is entitled, after payment, to the assignment or subrogation of all the rights, title, interest, and causes of action which the FDIC has against any person or entity, including any collateral held by the FDIC as security for the loans. Under such circumstances, section 7(e) requires the FDIC to execute all papers and render assistance to effectuate these rights of recovery that F & D acquires from the FDIC. If F & D chooses not to utilize its rights of assignment and subrogation under sections 7(a) and (b), any recovery made by the FDIC will be apportioned according to section 7(c).

### B. *Loan Payments*

After discovery of the loss, the FDIC received payments on several loans. The FDIC contends that the payments received after discovery of the loss should be allocated first to interest and then to principal. F & D, on the other hand, contends that these payments should be allocated only to principal, thereby reducing the amount of the jury verdict rendered in favor of the FDIC.

Funds received by the insured or the underwriter must be allocated in accordance with section 7(c) of the Bond. Section 7(c) provides that recoveries shall be applied, net of the expense of such recovery, as follows: (1) to satisfy the insured's loss in excess of the amount paid under the Bond; (2) to the underwriter as reimbursement of amounts paid in settlement of the insured's claim; and (3) to the insured to satisfy any deductible amount.

10. Bankers Blanket Bond, p. 5.

11. F & D asserts that sections 7(a) and (b) permit F & D to be assigned or subrogated to the FDIC's rights of recovery against persons and entities only, not collateral. This distinction is uncon-

vincing because the FDIC has rights, title, interest, and causes of action against each borrower, which include the collateral placed as security by the borrower.

Under section 7(c), any recovery must first be applied to satisfy the insured's loss in excess of the amount paid under the Bond. Thus, it is important for the Court to define the meaning of the insured's "loss" before the Court can determine how the recovery is to be apportioned. The term "loss" could have several meanings. "Loss" could be interpreted to mean only those losses within the coverage of the Bond or "loss" could be interpreted to include any loss, including those not within the purview of the Bond. Since it is clear that the parties intended for the insured to be indemnified only for losses which come within the scope of its agreement, the Court finds that the insured's "loss" under section 7(c) refers to losses which are covered under the Bond. Since recoveries must only be allocated to an insured's loss which is covered under the terms of the Bond, the Court must decide whether interest payments are considered losses within the coverage of the Bond.[12]

Section 2(t) provides that the Bond does not cover "potential income," which is defined as "including but not limited to interest and dividends, not realized by the insured."[13] The "potential income exclusion" explicitly excludes interest payments from coverage under the Bond.[14] Since interest is excluded from coverage under the Bond, interest is not a "loss" within the meaning of section 7(c). Thus, the loan payments received by the FDIC cannot be applied to interest, but must only be applied to principal.[15]

Under the priority provisions of section 7(c), the loan payments may still be allocated to satisfy the insured's loss which is in excess of the amount paid under the bond. In returning a verdict for the FDIC, the jury found that $5.3 million of losses were covered under the bond. The maximum coverage

provided under the Bond is $4 million. Thus, a total of $1.3 million of losses fall within the coverage of the Bond but are above the Bond's coverage limits. Under section 7(c), the loan payments recovered by the FDIC are allocated first to satisfy the FDIC's $1.3 million loss in excess of the Bond limits.[16] After the $1.3 million is satisfied, any remaining recoveries shall be allocated to F & D for reimbursement of the amounts F & D paid in settlement of the FDIC's claim. If any additional funds remain, they must be paid to the FDIC in satisfaction of any deductible amount.

In summary, the Court finds that F & D, after it makes payment under the Bond, shall have the right to assignment and subrogation of the FDIC's rights, title, interest, and causes of action which the FDIC has against any person or entity, including any collateral held by the FDIC as security for loans. The Court further finds that any loan payments recovered by the parties shall be allocated to principal only. These payments shall be made according to the following priority: (1) to the FDIC in satisfaction of the $1.3 million excess loss over the Bond's coverage limits; (2) to F & D as reimbursement of amounts it paid in settlement of the FDIC's claim; and (3) to the FDIC in satisfaction of any deductible amount.

## III. IS THE GULFPORT/BELELLO LOAN COVERED UNDER THE BOND?

In August 1986, Capital Bank approved a loan to Guy M. Belello ("Belello") on behalf of Gulfport Cablevision, Inc., for the stated purpose of constructing a cable television system in Gulfport, Mississippi. Capital Bank approved this loan based on Belello's representations that he had secured a cable

---

12. *First Nat'l Bank of Louisville v. Lustig*, Nos. 87–5488, 88–1682, 89–202, 1989 WL 145980, *2 (E.D.La.1989).

13. Bankers Blanket Bond, p. 4.

14. *Lustig*, 1989 WL 145980, at *2. See also, *Diversified Group, Inc. v. Van Tassel*, 806 F.2d 1275 (5th Cir.1987).

15. Section 7(e) provides that the insured shall do nothing after discovery of loss to prejudice the rights created by the Bond in favor of the under-

writer. This provision also prohibits the insured from keeping recoveries, to the prejudice of the underwriter, by executing after proof of loss but prior to payment by the underwriter. *Lustig*, 1989 WL 145980, at *2.

16. If the losses found by the jury had not exceeded the Bond limit, the loan payments recovered would have gone to F & D under the second category of priority in section 7(c).

television franchise from the city of Gulfport. In connection with the loan, Belello delivered to Capital Bank a document which was represented by Belello to be Public Ordinance No. 1258 of the city of Gulfport which purported to grant Gulfport Cablevision, Inc., a cable television franchise in Gulfport.[17] In reliance upon these representations Capital Bank loaned $1,469,150.00 to Gulfport Cablevision, Inc., and Belello.

The evidence reveals that the Gulfport City Council never adopted an ordinance granting a cable television franchise to Gulfport Cablevision, Inc., or Belello. The Belello ordinance was not an actual ordinance passed by the Gulfport City Council. It was a fraudulent act committed by Belello to induce Capital Bank to loan him over one million dollars. The signatures appearing on the Belello ordinance were not the actual signatures of the three Gulfport city officials who were listed on the document. The Belello ordinance which was furnished by Belello to Capital Bank contained a purported certification that it was a certified copy of the original ordinance. This purported certification by the Gulfport City Council clerk was not her actual signature.

At trial, the FDIC sought recovery under the Bond against F & D for the loss sustained by Capital Bank under the Gulfport/Belello loan. Following trial by jury, the jury made the following factual findings: (1) Capital Bank disbursed the funds to Belello in good faith reliance on the Belello ordinance; and, (2) Capital Bank had actual physical possession of the Belello ordinance before it disbursed the funds to Belello.

The Bond issued by F & D excludes from coverage certain types of loan losses sustained by Capital Bank. Thus, section 2(e) of the Bond provides that the Bond does not cover:

> [L]oss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any loan ... whether

such loan ... was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreements (A), (D), or (E);[18]

The parties agree that the loan by Capital Bank to Belello was induced and procured by Belello's fraud. However, the parties disagree over whether the loan loss is brought within the coverage of the Bond through Insuring Agreement (E), an exception to the exclusion from coverage under section 2(e). Insuring Agreement (E) provides in pertinent part:

> Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,
>
> (1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any original ...
>
> > (d) Certificate of Origin or Title, ... which
> >
> > (i) bears a signature ... of any person signing in any ... capacity which is a Forgery, or
> >
> > (ii) is altered, or
> >
> > (iii) is lost or stolen;
>
> (2) guaranteed in writing or witnessed any signature upon any ... [Certificate of Origin or Title];
>
> (3) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any [Certificate of Origin or Title] which is Counterfeit.
>
> Actual physical possession of the [Certificate of Origin or Title] by the Insured ... is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, [the Certificate of Origin or Title].... [19]

The FDIC contends that the Gulfport/Belello loan loss is covered under either paragraph (1)(i) or (3) of Insuring Agreement (E). For·coverage to exist under paragraph (1)(i)

---

**17.** The Court will refer to this fake ordinance as the "Belello ordinance." Ordinance No. 1258 was originally adopted by the Gulfport City Council to set the number of voting districts in Gulfport. It had nothing to do with cablevision or Belello.

**18.** Bankers Blanket Bond, p. 4, § 2(e).

**19.** Bankers Blanket Bond, p. 2.

or (3) of Insuring Agreement (E), the FDIC must prove the following elements: (1) a loss; (2) resulting directly from the insured having; (3) in good faith; (4) extended credit or otherwise acted upon; (5) any original bearing a forged signature, or any counterfeit; (6) certificate of origin or title. Actual physical possession of the certificate of origin or title is a condition precedent for the insured fulfilling the fourth requirement of extending credit on or otherwise acting upon the certificate of origin or title.

As noted earlier, the jury determined that Capital Bank extended credit to Belello in good faith reliance on the Belello ordinance and Capital Bank had actual possession of the Belello ordinance prior to extending credit to Belello. To determine whether the Gulfport/Belello loan loss falls within the coverage of Insuring Agreement (E), the Court must resolve the remaining contested issues of law which include: 1) whether the Belello ordinance is an original which bears a forged signature, or whether the Belello ordinance is a counterfeit; *and* 2) whether the Belello ordinance is a certificate of origin or title.

A. *Original Bearing a Forged Signature*

▮ Paragraph (1)(i) of Insuring Agreement (E) provides coverage for losses resulting from an insured acting upon any original certificate of origin or title which bears a signature which is a forgery. Paragraph (h) of the "Definitions" section of the Bond defines "forgery" as "the signing of the name of another with intent to deceive; it does not include the signing of one's own name with or without authority, in any capacity, for any purpose."

Since the signatures appearing on the Belello ordinance were not the actual signatures of the three Gulfport city officials, the forgery element is satisfied. In addition, the purported certification of the Belello ordinance was a forgery because the signature of the Gulfport City Council clerk was not her actual signature. Although the Belello ordinance and the purported certification bear signatures which are forgeries, the ordinance must also satisfy the "original" requirement

for coverage to exist under Paragraph (1) of Insuring Agreement (E). Thus, the Court must determine if the Belello ordinance was an "original" under the terms of the Bond.

In *Reliance Insurance Co. v. Capital Bancshares Inc./Capital Bank,*[20] the Fifth Circuit Court of Appeals held that bogus stock certificates were not "originals" under Insuring Agreement (E). In *Reliance,* the bank had accepted as security for loans it had made stock certificates which were later discovered not to be genuine stock certificates. In reaching its conclusion that the bogus stock certificates were not originals within the meaning of the Bond, the Fifth Circuit discussed the difference between the requirements of paragraphs (1), (2), and (3) of Insuring Agreement (E) and held:

[P]aragraph (1) of insuring agreement (E) provides no coverage here because paragraph (1) is limited to forged signatures on (or alteration, loss or theft of) "any original" of the several types of documents listed in its clauses (a) through (g)—clause (a) being "Security"—and here none of the bogus stock certificates may be considered an "original" "Security." The bogus stock certificates themselves were nothing but completely fabricated inventions lacking any actual relationship whatever to any of the matters stated on them. We observe that the requirement for an "original" in paragraph (1) of insuring agreement (E)— dealing with forgery, alteration, loss, or theft—is *not* present in paragraph (3) (dealing with counterfeits) or paragraph (2) (guaranteed or signature witnessed for transfer, etc.). This distinction should be given effect. It seems to us that the import of the distinction is that clause (1) is restricted to instruments which, apart from the forged signature or alteration (or loss or theft), are otherwise genuine, actual instruments of the kinds referenced which would have value as such. The bogus stock certificates are not such instruments. Since they are not an "original" "Security," no coverage is afforded under paragraph (1) of insuring agreement (E).[21]

---

**20.** 912 F.2d 756 (5th Cir.1990).

**21.** *Id.* at 758.

The requirement of an "original" in paragraph (1) of Insuring Agreement (E) pertains only to the forgery, altered, or lost or stolen elements contained in paragraphs (E)(1)(i), (ii), and (iii). The requirement of an "original" is not contained in paragraph (2) or paragraph (3). The importance of this distinction is that paragraph (1) is restricted to documents which, apart from the forged signature or alteration, loss or theft, are otherwise genuine, actual documents of the kind which would have value as such. Since the bogus stock certificates were completely fabricated inventions lacking any actual relationship whatsoever to any of the matters stated on them, the Fifth Circuit in *Reliance* concluded that the bogus stock certificates were not "originals" under paragraph (1) of Insuring Agreement (E).[22]

Following *Reliance*, the Belello ordinance cannot be considered an "original" because the entire Belello ordinance is a forgery. Paragraph (1)(i) of Insuring Agreement (E) only covers an original which bears a signature which is a forgery. The entire Belello ordinance was not an actual ordinance passed by the Gulfport City Council. The bogus ordinance is not a genuine, actual instrument of the kind referred to in the Bond which would have value. Thus, the Court holds that the Belello ordinance is not an "original" within the coverage of paragraph (1) of Insuring Agreement (E).

### B. *Counterfeit*

Although the Belello ordinance is not an original, precluding coverage under paragraph (1) of Insuring Agreement (E), the Belello ordinance may be a "counterfeit" falling under the coverage of paragraph (3) of Insuring Agreement (E). "Counterfeit" is defined in paragraph (d) of the "Definitions" section as "an imitation which is intended to deceive and to be taken as an original." This

definition requires that either there must now be or must have been an original document which the alleged counterfeit document attempts to imitate.[23]

If genuine Public Ordinance No. 1258 did not exist, the Belello ordinance could not have attempted to imitate an original and, therefore, could not be considered a counterfeit under the terms of the Bond.[24] However, genuine Public Ordinance No. 1258 does exist. Thus, the Court must determine whether the Belello ordinance is an imitation of the genuine ordinance which was intended to deceive and be taken as an original.

The Fifth Circuit decided this issue in *Bank of the Southwest v. National Surety Co.*[25] In *Bank of the Southwest,* the bank sought recovery under the "counterfeit" provision of Insuring Agreement (E) for losses it sustained on an automobile loan. The bank had loaned Lou Levine $7,000.00 which was secured by a 1970 Cadillac, evidenced by the surrender of a Tax Collector's Receipt for Title Application No. V–460376 ("white slip"). A Genuine Application No. V–460376 existed, but had been issued not to Levine, but to Arturo Rodriquez, and described not a 1970 Cadillac, but a 1969 Mercury. The Fifth Circuit, after quoting the definition of counterfeit which is similar to the F & D Bond, stated:

> The courts have often accepted this definition and held that there must be or must have been [an] original instrument that the alleged counterfeit document attempts to imitate.[26]

The Fifth Circuit held that the "white slip" held by the bank was not an imitation of an authentic original document and thus was not "counterfeit" within the coverage of Insuring Agreement (E).[27]

The facts in *Bank of the Southwest* are similar to those in this case. In *Bank of the*

**22.** *Id.*

**23.** *Reliance,* 912 F.2d at 757; *Richardson Nat'l Bank v. Reliance Ins. Co.,* 491 F.Supp. 121, 123 (N.D.Tx.1977), aff'd, 619 F.2d 557 (5th Cir.1980); *Bank of the Southwest v. National Sur. Co.,* 477 F.2d 73, 76 (5th Cir.1973). See also, *French Am. Banking v. Flota Mercante Grancolombiana, S.A.,* 925 F.2d 603, 604 (2d Cir.1991).

**24.** *Richardson,* 491 F.Supp. at 123, aff'd, 619 F.2d 557 (5th Cir.1980); *French American,* 925 F.2d at 604.

**25.** 477 F.2d 73 (5th Cir.1973).

**26.** *Id.* at 76.

**27.** *Id.* at 77.

*Southwest,* a genuine white slip existed, as did a genuine Public Ordinance No. 1258 in this case. In *Bank of the Southwest,* the bogus white slip was issued to someone other than the person to whom the genuine white slip was originally issued and the bogus white slip described a car different than that described by the genuine white slip. Similarly, the Belello ordinance was represented to be an ordinance passed by the city of Gulfport which granted Gulfport Cablevision, Inc., a cable television franchise in Gulfport, Mississippi. However, genuine Public Ordinance No. 1258 pertains to the number and location of voting districts in the city of Gulfport.[28] Genuine Public Ordinance No. 1258 has no relation to Belello or to a cable television franchise. The Court finds that the Belello ordinance is not an imitation of an authentic original document and is not "counterfeit" within the coverage of Insuring Agreement (E).[29]

This Court's conclusion is further supported by the Fifth Circuit's decision in *Reliance Insurance Co. v. Capital Bancshares Inc./Capital Bank* which was discussed earlier.[30] In *Reliance,* the bank accepted bogus AIG common stock certificates as security for a loan. The bogus stock certificates were made on a standardized, generic stock certificate form which differed in many facially obvious respects from a genuine AIG common stock certificate.[31] The Fifth Circuit held that the bogus stock certificates were not "counterfeits" within the coverage of Insuring Agreement (E).

In reaching this conclusion, the Fifth Circuit reasoned:

We reach this conclusion because there never existed any one or more particular genuine AIG stock certificates which the bogus certificates could be said to purport to be or represent or imitate, and because

the bogus certificates, by virtue of their facially apparent physical characteristics and the objective facts relating to their creation, as well as the subjective intent of their creator, do not constitute attempted or intended physical imitations or duplications of either the general form of genuine AIS stock certificates or any particular genuine AIG stock certificate. We believe this conclusion follows from our opinion in *Bank of the Southwest v. National Surety Company,* 477 F.2d 73 (5th Cir.1973), a case with entirely Texas facts, where we held that "there must be or must have been [an] original instrument that the alleged counterfeit document attempted to imitate.[32]

Although a genuine Public Ordinance No. 1258 does exist, the genuine ordinance differs significantly from the Belello ordinance. Genuine Public Ordinance No. 1258 pertains to voting districts in the city of Gulfport while the Belello ordinance pertains to a cable television franchise allegedly granted to Gulfport Cablevision, Inc. This difference is easily discernible from the caption provided at the top of the first page of each document. The genuine ordinance caption reads: "AN ORDINANCE INCREASING THE NUMBER OF ELECTION DISTRICTS OR PRECINCTS OF THE CITY OF GULFPORT AND FIXING THE METES AND BOUNDS DELINEATION OF SUCH DISTRICTS." The Belello caption reads: "GULFPORT CABLEVISION" and continues in the first paragraph to grant Gulfport Cablevision, Inc., a cable television franchise in the city of Gulfport.

Belello may have attempted to imitate or duplicate the general form of a Gulfport city ordinance, but in order to fit within the definition of "counterfeit," the courts require an original document which the alleged counter-

---

28. Genuine Public Ordinance No. 1258 is entitled: "AN ORDINANCE INCREASING THE NUMBER OF ELECTION DISTRICTS OR PRECINCTS OF THE CITY OF GULFPORT AND FIXING THE METES AND BOUNDS DELINEATION OF SUCH DISTRICTS." Amended Complaint, exhibit Q.

29. See, *Reliance Ins. Co. v. Capital Bancshares Inc./Capital Bank,* 685 F.Supp. 148 (N.D.Tx. 1988), aff'd, 912 F.2d 756 (5th Cir.1990).

30. 912 F.2d 756 (5th Cir.1990).

31. *Id.* at 760.

32. *Id.* at 757.

feit document attempts to imitate.[33] The Belello ordinance did not imitate any original Gulfport city ordinance, because no Gulfport city ordinance exists which grants Gulfport Cablevision, Inc., a cable television franchise in the city of Gulfport. Thus, the Court holds that the Belello ordinance is not "counterfeit" within the coverage of Insuring Agreement (E) because it is not an imitation of an authentic original document.

*Assuming arguendo* that the Belello ordinance is an "original" or "counterfeit," the Court finds that the Belello ordinance is not a "certificate of origin or title" within the coverage of Insuring Agreement (E).

## C. *Certificate of Origin or Title*

■ The Bond expressly defines the term "certificate of origin or title" in section 1, which provides in pertinent part:

> Certificate of Origin or Title means a document issued by ... a governmental agency evidencing the ownership of the personal property and by which ownership is transferred.[34]

In order for the FDIC to prove that the city ordinance is a "certificate of origin or title" within the definition of the Bond, the FDIC must show that the city ordinance is 1) a document; 2) issued by a governmental agency; 3) evidencing the ownership; 4) of personal property; 5) and by which ownership is transferred.

F & D does not contest elements 1, 3, and 4. F & D does challenge elements 2 and 5: whether the city ordinance was issued by a governmental agency and is a document by which ownership is transferred.

F & D alleges that the Belello ordinance cannot be a document "issued by a governmental agency" because the Belello ordinance was never issued by the Gulfport City Council but rather was a product of Belello and his fraudulent scheme. The Court disagrees with this contention. F & D's reading of the phrase "issued by a governmental agency" would eliminate from Insuring Agreement (E) the terms "forgery" and "counterfeit." The inclusion of "forgery" and "counterfeit" in Insuring Agreement (E) requires the conclusion that the issuance of a certificate of origin or title by a governmental agency could be a forgery or counterfeit. Although the Belello ordinance was not actually issued by the Gulfport City Council, the Belello ordinance could have been a forgery or counterfeit satisfying the element that it was "issued by a governmental agency."

F & D's contention that the city ordinance is not a document "by which ownership is transferred" is more persuasive.[35] The Belello ordinance specifically states on page 6, paragraph 11 that "[t]his right and franchise may not be transferred by Grantee without prior approval by the Council of the City of Gulfport...." The explicit language of the Belello ordinance shows that the cable television franchise could not be transferred by mere possession or ownership of the Belello ordinance. Instead, the ordinance required prior approval of the Gulfport City Council.

The actions of Capital Bank and Gulfport Cablevision, Inc., are also evidence that the Belello ordinance is not a document by which ownership is transferred. Capital Bank required Gulfport Cablevision, Inc. to sign a document entitled "Assignment of Contractual Rights." In this document Capital Bank had Gulfport Cablevision, Inc., "pledge, pawn, transfer and assign" to Capital Bank, without the approval of the Gulfport City Council, all rights which Gulfport Cablevision, Inc., had under the Belello ordinance.

---

33. *Reliance*, 912 F.2d at 757; *Richardson*, 491 F.Supp. at 123, aff'd, 619 F.2d 557 (5th Cir. 1980); *Bank of the Southwest*, 477 F.2d at 76. See also, *French American*, 925 F.2d at 604.

34. Bankers Blanket Bond, p. 3, § 1(c).

35. F & D quotes from the comment in the First Supplement 1980 revision of the Annotated Bankers Blanket Bond. The comment reflects the drafters' intentions to ameliorate the effects of court decisions which construed the words

"securities, documents, or other written instruments" which appeared in Section (E)(1) of the 1969 Bond from including almost any document relied upon by a bank regardless of whether the document was a security or similar to a security. The drafters crafted definitions of those instruments covered under Insuring Agreement (E) in Uniform Commercial Code terms and intended for cases construing the Bond definitions to rely on cases decided under the Uniform Commercial Code. F & D's memorandum, p. 10–11.

The explicit language of the Belello ordinance and the assignment of rights transaction between Capital Bank and Gulfport Cablevision, Inc., indicate that the Belello ordinance was not a document "by which ownership is transferred." Since the Belello ordinance does not fulfill element five of the certificate of origin or title definition, it is not a "certificate of origin or title" within the coverage of Insuring Agreement (E).

In summary, the Court finds that the loss sustained by Capital Bank on the Gulfport/Belello loan is not covered under Insuring Agreement (E) of the Bankers Blanket Bond. The Belello ordinance is not an "original" within the coverage of paragraph (1) of Insuring Agreement (E) and is not a "coun-terfeit" within the coverage of paragraph (3) of Insuring Agreement (E). *Assuming arguendo* that the Belello ordinance is found to be an "original" or "counterfeit," the Court also finds that coverage is precluded because the Belello ordinance is not a "certificate of origin or title" within the coverage of Insuring Agreement (E). Thus, F & D is not responsible for the $1,469,150.00 loan made to Gulfport Cablevision, Inc., and Belello.

## IV. CONCLUSION

The parties shall prepare and submit to the Court within twenty (20) days a judgment in accordance with the jury's verdict, the stipulations of the parties, and this opinion.

APPENDIX A–1
INTERROGATORY NO. 1
JURY INTERROGATORY
ALLIE RAY POGUE CLAIMS

With respect to Loan Group:

Loan:

Loan Date:

1. Did Allie Ray Pogue commit a dishonest or fraudulent act in connection with this loan?
 YES _____ NO _____
 If answer is no, please stop.
2. Did a loss result directly from Allie Ray Pogue committing a dishonest or fraudulent act with the manifest intent to cause Capital Bank a loss and to obtain a financial benefit for himself or others?
 YES _____ NO _____
 If answer is no, please stop.
3. Did discovery, as defined in the Bond, occur on this loan prior to October 1, 1987?
 YES _____ NO _____
 If the answer is no, please stop.
 IF YOU ANSWERED "YES" TO ALL OF THE ABOVE QUESTIONS, PLEASE ANSWER QUESTION NUMBER 4.
4. What is the amount of the loss on this loan resulting directly from Allie Ray Pogue's dishonest or fraudulent acts?
 AMOUNT $_____

_____ _____
Date FOREMAN

APPENDIX A–2
INTERROGATORY NO. 28
JURY INTERROGATORY
GULFPORT CABLEVISION CLAIM

1. Did Capital Bank have actual physical possession of the forged ordinance before it disbursed the funds on the loan?
 YES _____ NO _____
 If answer is no, please stop.
2. Did Capital Bank disburse the loan funds in good faith reliance on the forged ordinance?
 YES _____ NO _____

_____ _____
Date FOREMAN