[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11161
_____

D.C. Docket No. 0:10-cv-60786-MGC

COQUINA INVESTMENTS,

Plaintiff-Appellee,
Cross-Appellant,

versus

TD BANK, N.A.,

Defendant-Appellant,
Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(July 29, 2014)

Before ANDERSON and GILMAN,* Circuit Judges, and JOHNSON,** District
Judge.

_____

*Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by
designation.

**Honorable Inge Prytz Johnson, United States District Judge for the Northern District of
Alabama, sitting by designation.

ANDERSON, Circuit Judge:

This case arises out of the billion-dollar Ponzi scheme perpetrated by Scott Rothstein.  Plaintiff Coquina Investments ("Coquina") invested with Rothstein and lost over $6.7 million when his scheme collapsed.  Defendant TD Bank, N.A. ("TD Bank") was the bank through which Rothstein handled transactions with his investors.  Coquina claims that TD Bank made material misrepresentations and took other actions to help Rothstein perpetrate the fraud.

The case was tried before a jury, which returned a verdict for Coquina. The district court subsequently denied TD Bank's renewed motion for judgment as a matter of law and alternative motion for a new trial, to alter and amend judgment, and for remittitur.  TD Bank appeals that denial on multiple grounds.  It also appeals the district court's post-trial order imposing sanctions for discovery misconduct—i.e., as a sanction, the district court deemed two crucial facts established.  Coquina cross-appeals the district court's denial of its motion to amend its complaint to better plead a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim.  We affirm in all respects.

2

## I.    BACKGROUND[1]

A. Rothstein's Ponzi scheme[2]

In 2009, Scott Rothstein, then a prominent South Florida lawyer, purported to represent whistleblowers and victims of sexual harassment. According to Rothstein, the defendants in those cases agreed to pay enormous sums to avoid litigation. To ensure confidentiality, they supposedly entered into "structured settlements" in which they paid large amounts to Rothstein's law firm, Rothstein Rosenfeldt Adler ("RRA"), but required RRA to release the money over time, with the proviso that the victims would forfeit the deferred payments if they breached confidentiality. Some victims, Rothstein claimed, desperately wanted immediate payment and would forgo a large portion of the settlement to get it. On that pretext, Rothstein asked wealthy investors to finance immediate payments to victims of a fraction of the settlement in exchange for receiving the entire settlement in very quick installments. Rothstein assured his investors that the defendants had already deposited the full amount of the settlements in TD Bank trust accounts that RRA administered, so there was little or no risk of loss in the

---

[1]    This appeal comes to us following a long and complicated history, including a trial that lasted for over two months. We summarize the relevant facts and procedural history here, with more detail to follow as necessary to our analysis of the issues presented on appeal.

[2]    "A Ponzi scheme uses the principal investments of newer investors, who are promised large returns, to pay older investors what appear to be high returns, but which are in reality a return of their own principal or that of other investors." Wiand v. Lee, 753 F.3d 1194, 1201 (11th Cir. 2014).

investments that he offered.  In reality, the clients, defendants, and settlements were all fictitious; Rothstein used the money provided by new investors to repay old investors and to finance an elaborate lifestyle.

Coquina is a Texas investment partnership.  Partners and non-partners can apparently contribute capital to Coquina, which invests the capital in its own name and divides the profits in proportion to each investor's contribution.  Between April and October 2009, Coquina invested $37.7 million with Rothstein.  Coquina lost around $6.7 million when Rothstein's Ponzi scheme collapsed in late October 2009.

To convince Coquina to make multi-million dollar investments, Rothstein promised Coquina that the settlement money allegedly deposited by settling defendants could be held in a TD Bank trust account that contained heightened transfer restrictions.  Rothstein sent Coquina so-called "lock letters" signed by TD Bank's then-regional vice president Frank Spinosa, which claimed that the funds in the trust account could be disbursed only to Coquina.  That claim was false: Rothstein was able to transfer funds to himself from that account and did so on occasion.  Further, according to Coquina's version of the events, Spinosa falsely assured Coquina's investors that the restriction described in the "lock letters" was effective and commonplace at TD Bank.  Spinosa also allegedly told the investors

4

that there were millions of dollars in the restricted account when in fact there was only $100 in the account at the time.

### B. The settlement agreement

In November 2009, shortly after Rothstein's Ponzi scheme was discovered, creditors of RRA petitioned the Bankruptcy Court for the Southern District of Florida to reorganize the law firm under Chapter 11 of the Bankruptcy Code. On May 5, 2010, the appointed bankruptcy trustee ("the Trustee") sent Coquina a demand letter asserting claims against Coquina for avoidable transfers; the essence of the Trustee's claims against Coquina was to "claw back" the "return on investment" that Rothstein had previously distributed to Coquina. Coquina settled with the Trustee shortly before the trial in this case.

Under the settlement, Coquina agreed to immediately return $12.5 million to the RRA estate. Moreover, if Coquina prevailed in this case against TD Bank, the estate would receive a portion of Coquina's recovery—up to a maximum of $18.6 million. In return, the Trustee agreed to release any claims he might have against Coquina and its agents, partners, and related individuals or entities. The Trustee further agreed that Coquina would be allowed a general unsecured claim in the bankruptcy case for the amounts paid pursuant to the settlement.

As relevant to this appeal, the settlement agreement also contained the following recital:

5

[A]s a material inducement to entering into this Settlement, Coquina and its counsel have represented to the Trustee and his counsel that neither Coquina, nor its partners, [nor] investors . . . had any knowledge of the Rothstein Ponzi scheme . . . and that, as of the date of this Settlement Agreement, the Trustee has no knowledge to the contrary nor any indication of Coquina's knowledge of or complicity in or with the Rothstein Ponzi scheme.

## C.  Proceedings before the district court

Coquina filed this lawsuit against TD Bank on May 12, 2010, alleging that the bank aided and abetted Rothstein's Ponzi scheme, made fraudulent misrepresentations, and engaged in a pattern of racketeering activity in violation of RICO.[3]  The district court granted summary judgment in favor of TD Bank on the RICO claim and denied Coquina's request to amend.  The aiding and abetting and fraudulent misrepresentation claims went to trial.

This appeal primarily concerns three rulings made by the district court at trial.  First, the court allowed Spinosa to be called to testify even though he had decided to invoke his Fifth Amendment privilege against self-incrimination in response to all substantive questions.  The district court further instructed the jury that it could, but was not required to, draw adverse inferences against TD Bank from Spinosa's silence, and that it could, in conjunction with other evidence that was presented, consider Spinosa's silence in determining TD Bank's liability.

---

[3]    Rothstein was also named as a defendant in the complaint.  The district court entered default—but not default judgment—against him on November 8, 2010, and he is not a party to this appeal.

Second, the district court admitted into evidence, over TD Bank's hearsay objection, the settlement agreement between Coquina and the Trustee, including the recital quoted above that Coquina had represented to the Trustee that it did not know about Rothstein's fraud and that the Trustee knew of no information that would indicate otherwise. Coquina then used the recital for the truth of the matter asserted; that is, in its rebuttal at closing, Coquina used the recital as substantive evidence to counter TD Bank's defense that Coquina's investors knew or should have known that Rothstein's venture was fraudulent.

And third, the district court ruled that Coquina could claim as damages the amount that it paid—and will pay if it prevails in this case—in settlement to the RRA estate because the amount was reasonable and attributable to TD Bank's alleged misconduct.

The jury returned a verdict in favor of Coquina on both the aiding and abetting and the fraudulent misrepresentation claims. For each claim, the jury awarded Coquina $16 million in compensatory damages and $17.5 million in punitive damages. Thus, the total compensatory damages award was $32 million, of which approximately $7 million represented Coquina's actual loss from the Ponzi scheme ($6.7 million plus interest), and the remaining $25 million represented the sum of the $12.5 million that Coquina had already paid in settlement to the Trustee and the amount (another $12.5 million) that the Trustee is

7

entitled to receive under the settlement from Coquina's recovery in this case.[4] The

total damages award was $67 million. The district court subsequently denied TD

Bank's renewed motion for judgment as a matter of law and alternative motion for

a new trial, to alter and amend judgment, and for remittitur.

   D. Post-trial discovery sanctions

   Multiple problems with TD Bank's discovery came to light during and after

the trial. For example:[5]

1) TD Bank's Federal Rule of Civil Procedure 30(b)(6) designee testified before

   trial that there were no anti-money laundering ("AML") alerts for Rothstein's

   bank accounts until late September 2009 and less than five thereafter. But

   weeks before trial, TD Bank produced around 150 pages of AML alerts for

   Rothstein's accounts; TD Bank then produced more AML alerts, including

   alerts spanning 2008 to 2009, after trial commenced.

---

[4]     Coquina was clear as to the amounts it asked the jury to award. It explained to the jury
that it was "in the hole $20.5 million" at the time of trial because of its actual loss of $6.7
million, plus interest, and the $12.5 million settlement payment it had made to the Trustee.
Coquina then explained to the jury that of the amount it sought, around $32.8 million, it would
keep $20.5 million, and the remaining $12.5 million would go to the Trustee pursuant to the
settlement agreement. In other words, the $32.8 million would "mak[e] Coquina whole," and the
Trustee "w[ould] get another [$]12.5 million dollars, on top of the [$]12.5 [million] that Coquina
ha[d] already paid him," pursuant to the settlement. Thus, the total amount Coquina would pay
in connection with the settlement (i.e., the amount "clawed back" by the Trustee) would be
around $25 million.

[5]     Those seeking a more detailed account should see the district court's order on the
motions for sanctions. Coquina Invs. v. Rothstein, No. 10-60786-Civ, 2012 WL 3202273 (S.D.
Fla. Aug. 3, 2012).

2) Two TD Bank employees submitted affidavits during trial denying the existence of a document entitled the "Standard Investigative Protocol" ("SIP"), which outlined investigatory steps that employees must take whenever an account alerts. TD Bank confirmed post-trial that this protocol in fact exists. Moreover, the two employees who submitted the affidavits could have found the protocol by searching the relevant shared drive on their computers or, in the case of one employee, by reviewing his e-mails.

3) One of the documents TD Bank produced during discovery was a Customer Due Diligence ("CDD") form for RRA's bank accounts. The original CDD contained a red banner running across the top of the page with the words "HIGH RISK" in white, capital letters. The form produced to Coquina, however, did not contain a discernible "HIGH RISK" banner.

4) Two e-mail chains between TD Bank employees containing information relevant to whether Spinosa had signed and issued the "lock letters" described earlier were never produced to Coquina.

5) A consultant's report on Rothstein's accounts, which was created for an unrelated matter after discovery in this case had closed, was never produced to Coquina or to TD Bank's former outside counsel, Greenberg Traurig LLP.

Coquina moved post-trial for sanctions against TD Bank and Greenberg Traurig based on these alleged discovery violations, which the district court

9

granted.  The court noted that TD Bank had made most of the documents at issue available to Greenberg Traurig, which failed to properly produce them to Coquina. But the court also found, inter alia, that TD Bank willfully failed to correct Greenberg Traurig's mistakes as to the production of the CDD, that TD Bank willfully concealed documents from Greenberg Traurig, that TD Bank's employees failed to adequately search for the SIP before signing affidavits denying the protocol's existence, and that TD Bank's Rule 30(b)(6) witness was, at best, unprepared.  Based on these findings, the court concluded that Greenberg Traurig acted negligently and that TD Bank acted willfully in failing to comply with discovery orders.  Accordingly, the court entered an order under Federal Rule of Civil Procedure 37(b)(2)(A)(i) that two facts—that TD Bank's monitoring and alert systems were unreasonable and that TD Bank had actual knowledge of Rothstein's fraud—would be taken as established for purposes of this action.  The court also ordered TD Bank and Greenberg Traurig to pay Coquina's attorney's fees associated with litigating the sanctions and other related motions.

## II.    DISCUSSION[6]

A. Standing

TD Bank contends that Coquina lacks constitutional standing to maintain this suit.[7]  Specifically, TD Bank argues that Coquina has not suffered any injury-

---

[6]    We raise the question, sua sponte, of whether we have jurisdiction over TD Bank's appeal from the judgment against it and from the district court's sanctions order.  We conclude that we do.  Our decision in Arango v. Guzman Travel Advisors, 761 F.2d 1527, 1531 (11th Cir. 1985), governs our resolution of the first question, and it demonstrates that the absence of a default judgment against Rothstein, see supra note 3, does not require dismissal of TD Bank's appeal from the judgment against it under the circumstances of this case.  However, following the lead of Arango, we instruct the district court to take the appropriate action in entering final judgment to resolve Coquina's claims against Rothstein when this case is returned to the district court.  See 761 F.2d at 1531, 1538.

We also conclude that we have jurisdiction over the appeal of the order imposing sanctions on TD Bank.  We need not decide whether the sanctions order itself (which awarded attorney's fees but did not determine the amount of the fees) constitutes a final, appealable decision.  See Jaffe v. Sundowner Props., Inc., 808 F.2d 1425, 1426–27 (11th Cir. 1987) (holding that "[b]ecause the amount of attorney's fees has not yet been fixed, the [Rule 37 sanctions] order appealed from is not a final judgment"); Santini v. Cleveland Clinic Fla., 232 F.3d 823, 825 n.1 (11th Cir. 2000) (same).  But see Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emp'rs, ____ U.S. ____, ____, 134 S. Ct. 773, 777, 780 (2014) (holding that "the pendency of a ruling on an award for fees and costs does not prevent . . . the merits judgment from becoming final for purposes of appeal" even when "the statutory or decisional law authorizing [the] particular fee claim treat[s] the fees as part of the merits"); Budinich v. Becton Dickinson & Co., 486 U.S. 196, 202, 108 S. Ct. 1717, 1722 (1988) (holding that "an unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final").  Even assuming, arguendo, that the sanctions order is not itself appealable, we conclude that we have pendent jurisdiction over it because the sanction imposed in this case deems as established two factual allegations that are "inextricably intertwined" with the judgment on the merits against TD Bank.  See Fox v. Tyson Foods, Inc., 519 F.3d 1298, 1302 (11th Cir. 2008) (explaining that "[u]nder the doctrine of pendent appellate jurisdiction, a federal appellate court may address nonappealable orders if they are inextricably intertwined with an appealable decision or if review of the former decision is necessary to ensure meaningful review of the latter" (internal quotation marks omitted)).

[7]    "We review issues of standing de novo."  Arcia v. Fla. Sec'y of State, 746 F.3d 1273, 1278 (11th Cir. 2014) (internal quotation marks omitted).

11

in-fact because Coquina acted merely as a passive conduit for passing money from its own investors to Rothstein and vice versa.  We disagree.

Coquina is an investment partnership and is recognized under both Texas and Florida law as an entity legally distinct from its partners.  See In re Allcat Claims Serv., L.P., 356 S.W.3d 455, 463–64 (Tex. 2011); Larmoyeux v. Montgomery, 963 So. 2d 813, 819 (Fla. Dist. Ct. App. 2007).  Coquina invested with Rothstein in its own name, not in the names of its investors; the investment documents designated "Coquina Investments" as the entity entitled to repayment; and Coquina paid for the investments with funds from its own bank account. Therefore, Coquina acquired a right to the returns that Rothstein promised and suffered an economic loss when the returns failed to materialize.

Coquina was also injured as a result of its potential liability to the Trustee for avoidable transfers and its settlement with the Trustee in connection therewith. The settlement expressly defined the parties to the agreement as the Trustee and "Coquina Investments," and the settlement payments were made from "a Coquina account."  Article III does not require more.

Having thus disposed of the preliminary matter of standing, we turn to the merits.

12

B. Evidentiary rulings

TD Bank argues that the district court made several evidentiary errors that require a new trial. We review a district court's evidentiary rulings for an abuse of discretion. Collins v. Marriott Int'l, Inc., 749 F.3d 951, 959 (11th Cir. 2014). In order to justify granting a new trial, an error must have affected "substantial rights" or caused "substantial prejudice"; otherwise, the error is harmless. Id.; Peat, Inc. v. Vanguard Research, Inc., 378 F.3d 1154, 1162 (11th Cir. 2004).

1. *Testimony of Frank Spinosa*

TD Bank raises two arguments regarding the testimony of its former regional vice president, Frank Spinosa. First, it contends that the district court erred in allowing Coquina to call Spinosa as a witness even though Spinosa had made it known that he would invoke his Fifth Amendment privilege against self-incrimination. Second, TD Bank avers that the district court compounded its error by permitting Coquina to ask Spinosa questions that were not corroborated by independent evidence in the record and by permitting the jury to draw adverse inferences against TD Bank from Spinosa's refusal to answer those questions. Both arguments fail.[8]

---

[8]    TD Bank also ascribes error to the jury instruction concerning Spinosa's Fifth Amendment invocations. We summarily reject this argument. We have repeatedly said that "[w]hen the instructions, taken together, properly express the law applicable to the case, there is no error even though an isolated clause may be inaccurate, ambiguous, incomplete or otherwise subject to criticism." State Farm Fire & Cas. Co. v. Silver Star Health & Rehab., 739 F.3d 579, 585 (11th Cir. 2013) (internal quotation marks omitted). In any event, for the reasons we give in

13

a. *Did the district court err in allowing Coquina to call Spinosa as a witness?*

The Fifth Amendment privilege against compelled self-incrimination operates differently in criminal and civil contexts.  The ordinary rule in a criminal case is that no negative inference from the accused's silence is permitted.  See Griffin v. California, 380 U.S. 609, 615, 85 S. Ct. 1229, 1233 (1965).  In civil cases, however, the Supreme Court has said that "the Fifth Amendment does not forbid adverse inferences against parties . . . when they refuse to testify in response to probative evidence offered against them."  Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S. Ct. 1551, 1558 (1976).  "Th[is] rule allowing invocation of the privilege [by civil litigants], though at the risk of suffering an adverse inference or even a default, accommodates the right not to be a witness against oneself while still permitting civil litigation to proceed."  Mitchell v. United States, 526 U.S. 314, 328, 119 S. Ct. 1307, 1315 (1999).

Spinosa's status as a nonparty witness, rather than a litigant, adds a wrinkle that has not been considered by either the Supreme Court or this court.  When a party remains silent in the face of accusation, his silence is indicative of the reliability of the adverse inference drawn against him "if it would have been

---

Part II.B.1.b, infra, even if the instruction misstated the law by allowing the jury to draw adverse inferences based upon a few questions for which there was no independent corroborating evidence in the record, this error is harmless.  Fid. Interior Constr., Inc. v. Se. Carpenters Reg'l Council of United Bhd. of Carpenters & Joiners of Am., 675 F.3d 1250, 1259 (11th Cir. 2012) ("Jury instructions are subject to harmless error review" (internal quotation marks omitted)).

14

natural under the circumstances to object to the [accusation] in question." Baxter, 425 U.S. at 319, 96 S. Ct. at 1558 (internal quotation marks omitted).  However, a nonparty witness like Spinosa may invoke the privilege for a variety of reasons that are unrelated to the possibility of self-incrimination; for instance, a nonparty may purposefully choose not to contradict incriminating evidence in order to "saddle a defendant with liability by insinuation, particularly where the chance of prosecution of the witness is slim."  Charles H. Rabon, Jr., Note, Evening the Odds in Civil Litigation: A Proposed Methodology for Using Adverse Inferences When Nonparty Witnesses Invoke the Fifth Amendment, 42 Vand. L. Rev. 507, 534 n.189 (1989); F.D.I.C. v. Fid. & Deposit Co. of Md., 45 F.3d 969, 978 (5th Cir. 1995) ("The concern is that a non-party who stands in no special relationship to the party at the time of trial may purposefully invoke the privilege solely to discredit the party.").  Because the witness cannot be made to explain why the privilege has been invoked, the reliability of the adverse inference drawn from his silence is limited.  Cf. Brink's Inc. v. City of New York, 717 F.2d 700, 716–17 (2d Cir. 1983) (Winter, J., dissenting) (analogizing nonparties' invocations of the privilege to hearsay evidence).

Mindful of this potential for inaccuracy and unfairness, other circuits have held that the admissibility of a nonparty's invocation of the Fifth Amendment privilege against self-incrimination and the concomitant drawing of adverse

15

inferences should be considered "on a case-by-case basis." Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co., 819 F.2d 1471, 1481 (8th Cir. 1987); accord LiButti v. United States, 107 F.3d 110, 123 (2d Cir. 1997); F.D.I.C., 45 F.3d at 978; Rad Servs., Inc. v. Aetna Cas. & Sur. Co., 808 F.2d 271, 277 (3d Cir. 1986). A leading case on this issue is LiButti v. United States from the Second Circuit. LiButti recognized, as we do here, that the "overarching concern" that should guide the admissibility inquiry "is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." 107 F.3d at 124.  After surveying pertinent cases from the other circuits, LiButti identified four non-exclusive factors for courts to consider: (1) "the nature of the relevant relationships"; (2) "the degree of control of the party over the non-party witness"; (3) "the compatibility of the interests of the party and non-party witness in the outcome of the litigation"; and (4) "the role of the non-party witness in the litigation." Id. at 123–24 (capitalization altered).  LiButti made clear that these factors should be applied flexibly and that an invocation is not barred even if not all of the factors are satisfied.  See id.  We agree with and adopt the LiButti analysis—i.e., that the admissibility of a nonparty's invocation of the Fifth Amendment privilege and the concomitant drawing of adverse inferences should be considered by courts on a case-by-case basis.  We also agree that LiButti's non-

16

exclusive factors should be applied flexibly and that the overarching concern is whether the adverse inference is trustworthy under all of the circumstances.

Applying LiButti to our case, we conclude that the district court did not abuse its discretion in allowing Coquina to call Spinosa to the stand for the purpose of having him invoke the Fifth Amendment privilege in the jury's presence.[9] Three of the four LiButti factors counsel in favor of the trustworthiness of the adverse inferences drawn against TD Bank based upon Spinosa's invocation. First, although Spinosa was no longer employed by TD Bank at the time of trial, there is reason to believe that Spinosa still retained some loyalty to TD Bank. The bank paid Spinosa's legal fees associated with this action. See Rad Servs., 808 F.2d at 276 (stating that "[a]ny factors suggesting that a former employee retains some loyalty to his former employer—such as the fact that the employer is paying for his attorney"—serves the purpose of "reduc[ing] the chance that the employee will falsely claim to have engaged in criminal conduct for which the defendant employer is liable" (quoting Robert Heidt, The Conjurer's Circle—The Fifth Amendment Privilege in Civil Cases, 91 Yale L.J. 1062, 1119 n.214 (1982))). Moreover, Spinosa's attorney had offered to cooperate in TD Bank's internal investigations on his behalf. Second, the assertion of the privilege likely advanced

---

[9]    "The admissibility of a non-party's exercise of the Fifth Amendment against a party . . . is a legal question that we must review de novo. Nevertheless, if such evidence is not inadmissible as a matter of law, the district court's specific determination of relevance and its evaluation of a potential Fed.R.Evid. 403 problem are reviewed for abuse of discretion." F.D.I.C., 45 F.3d at 977.

the interests of both Spinosa and TD Bank in the outcome of this litigation. The chance is remote that Spinosa would have invoked the Fifth Amendment if he neither knew of nor participated in Rothstein's Ponzi scheme because doing so increased his own exposure to criminal prosecution. And third, Spinosa is a "key figure" in this case because his alleged actions and misrepresentations formed the bulk of Coquina's complaint. See Cerro Gordo Charity, 819 F.2d at 1482 (citing the invoking witness's role as a "key figure" in the lawsuit as a factor justifying the adverse inference).

Further, the record is replete with evidence that Spinosa, while acting as a regional vice president for TD Bank, knew of and participated in Rothstein's fraud. The evidence shows that Spinosa signed "lock letters" falsely claiming that the money held in a TD Bank trust account could be disbursed only to Coquina. Mel Klein and Kathleen White, two of Coquina's investors, testified that Spinosa falsely represented to them that the restriction described in the "lock letters" was both effective and commonplace at the bank. Klein and White also testified that Spinosa told them that there were millions of dollars in the trust account when in fact there was only $100 in the account at the time. Additionally, e-mails between Rothstein and Spinosa show that when Rothstein instructed Spinosa to "just answer yes to all [of Rothstein's] questions" in a conference call with Coquina's investors, Spinosa replied, "No problem." The e-mails also indicate that when Rothstein

18

asked Spinosa to wire $16 million for him from RRA's accounts at TD Bank to Morocco, where Rothstein fled after his Ponzi scheme was discovered, Spinosa complied.

Under these circumstances, we have no difficulty concluding that the adverse inferences drawn against TD Bank based upon Spinosa's invocation of the Fifth Amendment privilege—namely, that while acting as TD Bank's regional vice president, Spinosa had knowledge of Rothstein's fraud and assisted in its perpetration—were "trustworthy." [10] LiButti, 107 F.3d at 124. Accordingly, it was appropriate for the district court to allow Coquina to call Spinosa to the stand for the purpose of having him invoke the privilege in the jury's presence.[11]

---

[10]    The jury was instructed that "the knowledge and actions of a bank officer or director, such as" Spinosa, "may be imputed to a bank, such as" TD Bank. TD Bank has not clearly challenged this instruction on appeal. Consequently, we deem a trustworthy adverse inference as to Spinosa's knowledge and actions to be also trustworthy as to TD Bank's knowledge and actions.

[11]    It is of no moment that the district court had found before trial that the adverse inferences drawn against TD Bank based upon Spinosa's invocation of the Fifth Amendment privilege would be untrustworthy. "[C]ourts are free to change their minds." Johnson v. Hamrick, 196 F.3d 1216, 1223 (11th Cir. 1999). Although we would prefer for the district court to have explained its decision to reconsider its prior ruling, we believe that the admissibility of Spinosa's invocations under the facts of this case is not a close enough question for us to require an explanation. Cf. id. at 1223–24 (remanding in the different context of a bench trial involving voting rights issues because the district court did not provide sufficient justification for its reconsideration of a prior finding where the issue was "extremely close").

b. *Did the district court err in permitting Coquina to ask Spinosa questions not supported by independently admissible evidence?*

TD Bank further contends that the district court erred in allowing Coquina to ask Spinosa leading questions that were not corroborated by independent evidence in the record and in allowing the jury to draw adverse inferences from his refusal to respond to those questions. Specifically, TD Bank challenges several questions put to Spinosa that were based on inadmissible hearsay and information that Coquina's counsel received from the Trustee in violation of an order entered in the bankruptcy case.[12]

In contexts other than invocation of the Fifth Amendment, counsel may ask a question of a witness if he has a good-faith basis to ask it. Cf. United States v. Crutchfield, 26 F.3d 1098, 1102 (11th Cir. 1994). A good-faith basis does not have to be "definitive proof," United States v. Beck, 625 F.3d 410, 418 (7th Cir. 2010), and may be based on inadmissible evidence, see United States v. Tucker, 533 F.3d 711, 714–15 (8th Cir. 2008) (allowing the use of an out-of-court testimonial statement as a good-faith factual basis for a line of inquiry); cf. United States v. Guay, 108 F.3d 545, 552–53 (4th Cir. 1997) (concluding that "an official

---

[12] The questions include: "Mr. Spinosa, did Scott Rothstein give you a manila envelope filled with $50,000 cash . . . at the Bova Restaurant on Las Olas Boulevard in or around August of 2009?"; "Did Scott Rothstein approach you, in 2009, to make sure that the Weston branch manager, Rosanne Caretsky, was a quote, 'player,' who could be trusted in connection with his fraud scheme?"; "Did you tell Scott Rothstein that she was a player?"; and "[D]id you tell Scott Rothstein that he had your permission to sign your name when you were unavailable?"

20

investigative report, which was filed with the court under seal, . . . gave the prosecutor a good-faith basis for asking the questions").

The district court found that Coquina's counsel had a good-faith basis for the questions posed to Spinosa, and TD Bank does not challenge that finding on appeal. However, TD Bank argues that because Coquina's counsel knew that Spinosa would invoke the privilege against self-incrimination, Coquina's counsel could not ask leading questions in the jury's presence unless he could produce other independently admissible evidence that corroborated them. TD Bank relies heavily on a case from the Ninth Circuit, Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258 (9th Cir. 2000). In Doe, the plaintiff sought to introduce at trial the defendant's invocation of the Fifth Amendment privilege to support an adverse inference against the defendant. Id. at 1262. The Ninth Circuit held that an "adverse inference can only be drawn when" silence is countered by "independent evidence . . . of the fact to which the party refuses to answer." Id. at 1264. The court further stated that, because "the assertion of the privilege necessarily attaches only to the question being asked and the information sought by that particular question," each "specific fact being questioned" must be "corroborated by other evidence" in the record. Id. at 1265, 1266 n.2.

We need not decide whether to adopt Doe as the law of this Circuit; even assuming that the district court exceeded its discretion in allowing Coquina to ask

21

Spinosa a few questions that were not corroborated by independently admissible evidence and in authorizing the jury to draw adverse inferences therefrom, the error did not affect TD Bank's "substantial rights." Collins, 749 F.3d at 959. Both before the district court and on appeal, TD Bank identified only a handful of questions out of Spinosa's two-hour testimony that implicate this potential error.[13] See Appellant's Br. at 30–31; see also supra note 12. The questions relate to acts that Spinosa allegedly performed to assist Rothstein in his Ponzi scheme and benefits that Spinosa allegedly received in return. See supra note 12. Consequently, the only negative inferences that could have been obtained from Spinosa's refusal to answer those questions were that Spinosa committed those acts and received those benefits. The jury could have drawn similar adverse inferences from Spinosa's refusal to answer numerous other questions that were indisputably supported by independent corroborating evidence. Coquina's counsel asked Spinosa, inter alia: if he responded "no problem" after Rothstein told him to just "answer yes" to Rothstein's questions during a conference call with Coquina's investors; if he signed "lock letters" that misrepresented Rothstein's ability to transfer money from a TD Bank trust account designated for Coquina's benefit; if he made untrue statements to Coquina's investors about the restriction described in

---

[13]    "Neither the district court nor this court has an obligation to parse a . . . record to search out facts or evidence not brought to the court's attention. Notwithstanding this, we have reviewed sufficient portions of the record to give us comfort that able counsel have not overlooked significant evidence in their briefs to the district court and this court." Atlanta Gas Light Co. v. UGI Utils., Inc., 463 F.3d 1201, 1208 n.11 (11th Cir. 2006).

the "lock letters" and the amount of money that was in the purportedly restricted account; and if he sent a wire transfer of $16 million to Morocco at Rothstein's request. The jury could have inferred from Spinosa's silence in response to these questions that the answer in each case would have been "yes."

Because the only adverse inferences that could have been drawn from Spinosa's refusal to answer the questions implicating the alleged error were essentially duplicative of other questions amply supported by properly admitted evidence, any error by the district court in allowing Coquina to ask those questions and in authorizing the jury to draw negative inferences therefrom is harmless. Cf. Drew P. v. Clarke Cnty. Sch. Dist., 877 F.2d 927, 931–32 (11th Cir. 1989) (holding that the evidence at issue, "even if improperly admitted, w[as] merely cumulative of other evidence and therefore [its] admission was not reversible error"). We accordingly find no abuse of discretion in the district court's refusal to grant a new trial on this basis.

### 2. *The settlement agreement recital*

TD Bank's main defense at trial was that Coquina had waived its claims because its investors had actual or constructive knowledge that Rothstein's venture was fraudulent and yet continued to invest. Rothstein's "investments" promised returns of, for example, 37.5 percent in three months and 50 percent in four months

23

with little risk.[14]  TD Bank argued to the jury that Coquina's investors were sophisticated investors who should have known that the investment terms were simply "too good to be true."

Over TD Bank's objection, the district court admitted into evidence the settlement agreement between Coquina and the Trustee.  The agreement stated in pertinent part:

> [A]s a material inducement to entering into this Settlement, Coquina and its counsel have represented to the Trustee and his counsel that neither Coquina, nor its partners, [nor] investors . . . had any knowledge of the Rothstein Ponzi scheme . . . and that, as of the date of this Settlement Agreement, the Trustee has no knowledge to the contrary nor any indication of Coquina's knowledge of or complicity in or with the Rothstein Ponzi scheme.

TD Bank asked the district court to redact this recital from the copy of the settlement agreement shown to the jury, arguing that it constituted inadmissible hearsay and was unfairly prejudicial, but the district court declined.  Coquina does not dispute on appeal that the recital was inadmissible hearsay but contends that its admission was harmless.

We do not doubt that the recital had some prejudicial effect on TD Bank's defense.  At the end of its rebuttal at closing, Coquina's counsel stated that TD Bank was asking the jury to believe that Coquina should have known about Rothstein's scheme.  Coquina's counsel then said:

---

[14]    According to TD Bank, the annualized rate of return for these "investments" ranged from 93.8 to 600 percent.

24

> [I]f you look at the settlement agreement, you will see that . . . there is a denial that we had any knowledge of the Ponzi scheme in that document[,] and the settlement agreement that was entered into with the [T]rustee and approved by the bankruptcy court says that the [T]rustee had no knowledge or any indication of Coquina's knowledge of or complicity in or with the Rothstein Ponzi scheme.

This remark was one of the last things the jury heard before deliberating and called to the jury's attention the fact that, as part of the settlement with the Trustee, Coquina denied knowledge of the Ponzi scheme and the Trustee professed no knowledge or indication that Coquina's denial was untrue.

Some prejudice alone, however, does not require a new trial; "a new trial is warranted only where the [evidentiary] error has caused substantial prejudice to the affected party." Peat, 378 F.3d at 1162. To determine if improperly admitted evidence has caused "substantial prejudice," we look to, inter alia, the persuasive weight of the inadmissible evidence and the overall strength of the other evidence on the issues affected. See id. Several reasons persuade us in this case that this error did not cause substantial prejudice to TD Bank.

First, the recital contained merely an inference of innocence. The recital simply stated what Coquina had "represented to" the Trustee and what the Trustee professed to know at the time of the settlement agreement. It was only sparsely mentioned during the trial—just an isolated, albeit well-timed, reference toward the end of a two-hour closing argument. And it was patently self-serving on the part of both Coquina and the Trustee. We therefore do not believe that the recital

25

was likely to carry great weight with the jury, which heard mountains of evidence over a two-month period.

Second, the jury was expressly charged that argument of counsel is not evidence. The district court instructed the jury that "anything the lawyers say is not evidence in th[is] case" and that it is the jury's "own recollection and interpretation of the evidence that controls."

Finally, and most significantly, Coquina presented considerable other evidence that countered TD Bank's "too good to be true" defense. Coquina established that Rothstein's Ponzi scheme involved hundreds of victim investors, and it argued to the jury that "[y]ou can't have a fraud of that scope . . . and in the same breath call [the fraud] obvious." Coquina also introduced evidence showing that TD Bank knew about the terms of the "investments" that Rothstein offered, including annualized returns ranging from 200 to 500 percent. Coquina insisted to the jury that TD Bank could not have it both ways—it could not simultaneously argue that Coquina should have known the investment terms were "too good to be true" and that TD Bank had no reason to be suspicious of the same investments. Furthermore, Coquina introduced evidence demonstrating that it diligently investigated Rothstein's venture before investing. Coquina's investors testified that they sought confirmation from TD Bank on multiple occasions about the settlement money that Rothstein claimed was in a TD Bank trust account and about

26

the restrictions placed on Rothstein's ability to transfer money out of that account. Coquina presented evidence and argued to the jury that its investors had no reason to believe that the TD Bank employee with whom they spoke, Spinosa, was not telling the truth. Spinosa was, after all, TD Bank's regional vice president. Thus, after hearing Spinosa's assurances, the investors had no reason to be suspicious about the investments that Rothstein offered.

In light of the foregoing, we find that sufficient evidence untainted by any error supports the verdict and that the error therefore did not substantially influence the outcome of the case. Cf. Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, the Ecumenical Order, 702 F.3d 1279, 1295–96 (11th Cir. 2012). We therefore conclude that, while the district court erred, such error does not warrant a new trial.

C. Damages

TD Bank next argues that the damages award should be vacated or reduced, or that a new trial on damages should be ordered. On damages issues, "we review de novo the district court's denial of a motion and renewed motion for judgment as a matter of law [while e]videntiary rulings are reviewed for abuse of discretion." Fla. Transp. Servs., Inc. v. Miami-Dade Cnty., 703 F.3d 1230, 1243 (11th Cir. 2012) (internal citation omitted), cert. denied, 134 S. Ct. 116 (2013).

1. *Settlement payments to the Trustee*

TD Bank contends that the district court erred in allowing Coquina to claim as damages the amount it agreed to pay in settlement to the RRA estate. We disagree.

Shortly before trial, Coquina and the Trustee entered into a settlement agreement under which Coquina agreed to pay the RRA estate $12.5 million upfront and to give the estate a portion of Coquina's recovery in this case, up to a maximum of $18.6 million. The Trustee agreed in return to release all claims against Coquina or its investors. At trial in this case, Coquina requested, and the jury awarded, $32 million in compensatory damages, $25 million of which was for settlement payments to the Trustee.[15]

In GAB Business Services., Inc. v. Syndicate 627, we held that a plaintiff seeking to claim as damages under Florida law the amount paid in settlement to a third party must first prove its "actual or potential liability" to that third party. 809 F.2d 755, 760–61 (11th Cir. 1987). We required proof only of potential liability where the plaintiff informed the defendant of a proposed settlement and the defendant failed to object. See id. at 760. If, however, the defendant was not given an opportunity to review or participate in the settlement, we required "a demonstration of actual as opposed to potential liability." Id. In either case, we

---

[15]    The other approximately $7 million represented Coquina's actual losses (before the Trustee's "clawback") in Rothstein's Ponzi scheme—i.e., $6.7 million plus interest.

28

said, the plaintiff "could only recover so much of the settlement as it proved was reasonable in amount . . . and a consequence of [the defendant's misconduct]." Id. at 761 (internal citation omitted).

TD Bank's counsel appeared at the settlement-approval hearing and did not oppose the settlement, even though he had at least two opportunities to do so. Because TD Bank "received adequate protection during the settlement negotiations," Coquina needed to prove only its "potential liability" to the Trustee. Id. Coquina met this burden. It produced evidence showing that it received $28.1 million from Rothstein within ninety days of RRA's bankruptcy filing. This amount is, of course, potentially avoidable and recoverable by a bankruptcy trustee as a preferential transfer under 11 U.S.C. § 547. See infra.

Coquina has also sufficiently demonstrated that the $25 million it sought and successfully recovered from TD Bank—i.e., the amount Coquina asked the jury to award that was attributable to the settlement with the Trustee—was "reasonable in amount" and was "a consequence of" TD Bank's alleged misconduct. GAB Bus. Servs., 809 F.2d at 761. "Whether a settlement is reasonable depends upon what a reasonably prudent person in the position of the defendant [here, Coquina] would have settled for on the merits of the plaintiff's [here, the Trustee's] claim," taking into account factors such as "the extent of damages" and "the certainty of liability." Id. at 761 n.10 (internal quotation marks omitted). Because circuit

29

courts have routinely allowed bankruptcy trustees to "claw back" and recover transfers made to investors of Ponzi schemes within ninety days of the filing of the bankruptcy petition, see, e.g., In re M & L Bus. Mach. Co., 84 F.3d 1330, 1339–40 (10th Cir. 1996); In re Bullion Reserve of N. Am., 836 F.2d 1214, 1216–19 (9th Cir. 1988), Coquina would almost certainly be liable to the Trustee for the entire $28.1 million that it received from Rothstein within ninety days of RRA's bankruptcy filing. Coquina's decision to settle with the Trustee, and to seek from TD Bank $25 million in connection therewith, was therefore patently reasonable. Furthermore, the $25 million was clearly a loss to Coquina caused by TD Bank's tortious conduct. It was approximately $3 million less than the $28.1 million that Rothstein had transferred to Coquina pursuant to the Ponzi scheme that TD Bank aided and abetted, which amount the Trustee could have fully "clawed back" from Coquina because it had been transferred within ninety days before RRA filed for bankruptcy.

For the foregoing reasons, Coquina has amply satisfied the requirement of GAB Business Services—i.e., that its settlement with the Trustee was pursuant to its potential liability to the Trustee, that its settlement was reasonable, and that the $25 million amount of the settlement that Coquina sought to recover from TD Bank was a loss to Coquina caused by TD Bank's aiding and abetting the Ponzi scheme.

Against these points, TD Bank makes several arguments that we find unpersuasive.  We reject as meritless TD Bank's first argument that Coquina failed to show that its settlement payments to the Trustee constituted losses attributable to TD Bank's misconduct.  The $25 million that Coquina was awarded in this case was clearly attributable to the Trustee's claim "clawing back" and recovering for the RRA estate the preferential transfers made by Rothstein to Coquina as part of the Ponzi scheme.

Second, TD Bank asserts that the settlement amount was "inherently unreasonable" because a portion of the settlement was conditioned on Coquina's recovery in this case.  TD Bank has not cited, and our research has not found, any case from Florida that addresses a similar situation involving a conditional settlement like the one in this case.  Florida case law, however, shows beyond doubt that "settlements are highly favored and will be enforced whenever possible."  Robbie v. City of Miami, 469 So. 2d 1384, 1385 (Fla. 1985); accord Antar v. Seamiles, LLC, 994 So. 2d 439, 442 (Fla. Dist. Ct. App. 2008).  We therefore conclude that it is unlikely that the Florida Supreme Court would adopt the bright-line rule posited by TD Bank, given that an absolute bar against indemnity for conditional settlements could "force [plaintiffs] to turn down advantageous settlement offers."  Trs. of the Univ. of Pa. v. Lexington Ins. Co., 815 F.2d 890, 901–02 (3d Cir. 1987) (applying Pennsylvania law and upholding

the validity of conditional settlements "subject to the requirements of good faith and reasonableness"); cf. Hitt v. Cox, 737 F.2d 421, 426 (4th Cir. 1984) (applying Virginia law and recognizing that parties negotiating the conditional portion of two-tiered settlements "no longer have adverse interests," but holding that conditional settlements are "presumptively," not inherently, unreasonable).

Third, TD Bank argues that Coquina's losses resulting from the settlement are too speculative to support an award of damages. TD Bank points out that, under the settlement agreement, Coquina has an allowed unsecured claim in the bankruptcy case for amounts paid pursuant to the settlement. In other words, at the time of trial, there was a possibility that some or all of the settlement payment from Coquina would be returned to Coquina by the RRA estate. It is true that a plaintiff cannot recover for losses that are speculative or uncertain. See Aldon Indus., Inc. v. Don Myers & Assocs., Inc., 517 F.2d 188, 191 (5th Cir. 1975) (applying Florida law).[16] But to our knowledge, no court has held that an amount of loss is speculative just because the loss resulted from the surrender of a preference and the injured party has an unsecured claim in the bankruptcy case for the property surrendered. We cannot conclude that this factor indicates that the damages awarded by the jury were speculative.

---

[16]    The Eleventh Circuit in an en banc decision, Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

32

We therefore conclude that the district court properly permitted Coquina to claim as damages the amount that it paid—and will pay upon prevailing in this case—in settlement to the RRA estate. The evidence sufficiently established that the $25 million that Coquina sought, and that the jury awarded, in connection with the settlement was reasonable in amount and was attributable to TD Bank's alleged misconduct. We note, however, that post-trial developments suggest that: (1) the RRA estate has returned a substantial portion of the $12.5 million that Coquina had already paid pursuant to the settlement; (2) the balance of the $12.5 million will likely be returned to Coquina in the near future; and (3) the portion of Coquina's recovery from this case that the estate would receive under the settlement may also be returned. Consequently, there is the possibility of a double recovery by Coquina—recovering $25 million from TD Bank as damages in this case and receiving $25 million from the RRA estate from the unsecured claim in the bankruptcy case. There is already a Rule 60(b) motion pending in the district court raising the issue of whether the damage award should be reduced in light of these post-trial developments. We believe that the Rule 60(b) proceeding is the proper vehicle for resolving this and related issues. If the district court determines that a reduction in compensatory damages is appropriate, the court should also consider whether a proportionate reduction of punitive damages is required.

2. *TD Bank's remaining arguments*

We summarily reject TD Bank's remaining arguments concerning the damages award. We perceive no abuse of discretion in the district court's rulings on discovery, evidentiary, and jury-instruction issues in connection with the reasonableness of the settlement amount. We also reject TD Bank's argument that the jury award reflected duplicative damages. We agree with the district court that, in light of the instructions to the jury, the verdict form, and the evidence, it is clear that the jury intended a total of $32 million in compensatory damages and $35 million in punitive damages.

D. Sanctions

Finally, TD Bank contends that the sanction ordered by the district court was based on clearly erroneous findings of fact and violated due process. As explained above, the district court ordered two facts—that TD Bank's monitoring and alert systems were unreasonable and that TD Bank had actual knowledge of Rothstein's fraud—be taken as established for purposes of this action.

Federal Rule of Civil Procedure 37(b) provides that a district court may impose sanctions upon a party for failure to comply with a discovery order, including "directing that . . . designated facts be taken as established for purposes of the action." Fed. R. Civ. P. 37(b)(2)(A)(i). "Our caselaw is clear that only in a case where the court imposes the most severe sanction—default or dismissal—is a finding of willfulness or bad faith failure to comply necessary." BankAtlantic v.

34

Blythe Eastman Paine Webber, Inc., 12 F.3d 1045, 1049 (11th Cir. 1994).  In this case, the district court found that TD Bank's discovery violations were willful, but this finding was not necessary to the sanction that the court chose to impose.  TD Bank nevertheless maintains that the district court's finding of willfulness was clearly erroneous and that but for this finding, the court would have selected a less severe sanction.

Significantly, TD Bank is not arguing that the district court erred in imposing sanctions at all.  Nor would such an argument be tenable.  The district court's order granting the motions for sanctions provides numerous examples of troubling—perhaps even willful—discovery violations by TD Bank and its employees.  For example, two TD Bank employees apparently failed to reasonably search for a document in the relevant shared drive before signing affidavits denying the document's existence.  As another example, TD Bank's Rule 30(b)(6) designee was, at best, woefully unprepared: he testified that there were no AML alerts for Rothstein's bank accounts until late September 2009 and less than five thereafter, when in fact, there were at least 150 pages of alerts spanning 2008 to 2009.

TD Bank instead argues that the district court erred in imposing this particular sanction—that is, deeming as established TD Bank's actual knowledge of the fraud and the unreasonableness of its account-monitoring systems.  This is

not, however, an issue that we have to decide. Wholly aside from the sanction, both facts are in any event established by ample evidence in the record. Therefore, there is no need for those facts to be established as a sanction. In light of our earlier conclusion that the evidence in the record overwhelmingly supports the conclusion that TD Bank, through Spinosa, knew of Rothstein's Ponzi scheme, see supra Part II.B.1, any error in the district court's decision to impose the sanction that it chose, or in its predicate finding of willfulness, is harmless.[17]

Although we need not, and do not, address the correctness vel non of the district court's findings with respect to the sanctions issue, we do believe that the district court clearly erred in at least one subsidiary finding: that "TD Bank acted willfully in failing to rectify Greenberg Traurig's error [as to the production of the CDD] or allowing it to endure." The CDD was one of thousands of documents TD Bank produced in this litigation. Unlike the district court, we see nothing

---

[17]    TD Bank in fact states on appeal that the "'reasonableness' of [its] monitoring systems was legally irrelevant to Coquina's claims at trial . . . [and thus that part of the sanction] did not even directly relate to . . . issues properly in dispute at trial." Appellant's Br. at 62 (emphasis in original). A sanction establishing an "irrelevant" fact as conclusively proven, even if erroneously ordered, is doubtlessly harmless.

We note that TD Bank does not contend that it was impeded by the sanctions order from effectively arguing that the evidence in the record was insufficient to support a conclusion that Spinosa, and therefore TD Bank, knew about and assisted Rothstein's Ponzi scheme. Moreover, even if this argument had been raised, we would conclude that it has no merit under the circumstances of this case. TD Bank challenged the sanctions order and thus could have made arguments on appeal, conditioned on our reversal of the sanctions order, challenging the facts that the sanctions order deemed established. Of course, such a challenge would have been futile in light of the overwhelming evidence that Spinosa, and thus TD Bank, had knowledge of the Ponzi scheme.

36

incredible or implausible in the explanation that neither TD Bank's in-house lawyers nor its representatives who were present at trial knew what the CDD was supposed to look like.  Therefore, we cannot conclude on this record that the TD Bank representatives present at trial would necessarily have had reason to notice that the copy of the CDD introduced at trial was missing important details.  In our judgment, however, for the reasons already stated, this error and any other deficiencies in the district court's findings do not warrant reversing the sanction imposed in this case.[18]

### E.  Coquina's cross-claim

Coquina cross-appeals on a single ground: that the district court erred by denying its motion to amend its complaint to better plead a RICO claim.  We review a district court's denial of a motion to amend a complaint for abuse of discretion.  Smith v. Fla. Dep't of Corr., 713 F.3d 1059, 1063 (11th Cir. 2013). We have observed that "though leave to amend is freely given when justice so requires," a district court may "deny such leave where there is substantial ground for doing so, such as undue delay . . . and futility of amendment."  Reese v.

---

[18]    We summarily reject TD Bank's argument that the sanction imposed by the district court violated due process because the sanction was not specifically related to the alleged discovery violations.  The documents that were improperly produced in this case could have been used by Coquina to show that TD Bank willfully ignored the AML alerts and other risk indicators generated for Rothstein's accounts.  A jury could have inferred from those documents both that TD Bank had knowledge of Rothstein's fraud and that it had unreasonable systems in place to prevent fraud.

Herbert, 527 F.3d 1253, 1263 (11th Cir. 2008) (internal alternation and quotation marks omitted).

A brief chronology of events puts this issue in proper perspective.  Coquina alleged in its complaint that TD Bank had "engaged in a pattern of related and continuous [RICO] predicate acts over a substantial, but closed, period of time."[19] TD Bank moved to dismiss the RICO claim, arguing in part that Coquina had failed to sufficiently plead a closed-ended pattern of racketeering activity and thus could not satisfy RICO's continuity requirement.  The district court denied TD Bank's motion to dismiss, finding sufficient Coquina's allegation that an enterprise extending over a period of four years existed.

In May 2011, TD Bank moved for summary judgment on the RICO claim, arguing again that Coquina had failed to prove a closed-ended pattern of racketeering activity.  TD Bank contended that the RICO predicate acts alleged by Coquina occurred over too short a time period to establish closed-ended continuity. To support this assertion, TD Bank cited Jackson v. BellSouth Telecommunications, 372 F.3d 1250 (11th Cir. 2004), in which we explained that the relevant period is the time during which "the specific incidents . . . actually

---

[19]    RICO's continuity requirement can be satisfied either by showing a "closed-ended" pattern of racketeering activity—i.e., "a series of related predicates extending over a substantial period of time"—or by proving an "open-ended" pattern of racketeering activity—i.e., predicate acts that "include a specific threat of repetition extending indefinitely into the future" or that "are part of an ongoing entity's regular way of doing business."  Jackson v. BellSouth Telecommunications, 372 F.3d 1250, 1265 (11th Cir. 2004) (internal quotation marks omitted).

charged" occurred and held that "nine months is not an adequately substantial period of time" for closed-ended continuity. Id. at 1266–67. TD Bank also cited a decision from the Second Circuit, Spool v. World Child Int'l Adoption Agency, 520 F.3d 178 (2d Cir. 2008), which held that "[t]he relevant period . . . is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." Id. at 184.

In its response brief to the district court, Coquina disputed that the relevant period for determining continuity is the time during which the alleged predicate activity—i.e., the alleged acts of fraud against Coquina—occurred, claiming instead that continuity should be "evaluated in the context of the entire fraud involving TD Bank," including acts of fraud against other Rothstein investors in prior years. Coquina also argued, in the alternative, that it could demonstrate continuity by proving an open-ended pattern of racketeering activity. TD Bank then pointed out in its reply brief that open-ended continuity was a new theory that had not been pled.

Coquina was therefore on notice by June 2011, when TD Bank filed its reply brief, that several cases, including a case from the Eleventh Circuit, indicate that the relevant period for determining continuity is not the time during which the underlying scheme operated, but rather the time during which "the specific incidents . . . actually charged" occurred. Jackson, 372 F.3d at 1266. Accordingly,

Coquina was on notice by then that its closed-ended continuity theory, which was based on predicate acts spanning only five months, may have been untenable. And significantly, Coquina was also on notice by June 2011 that it had not pled open-ended continuity. Coquina nevertheless did not move to amend its complaint to add an open-ended pattern of racketeering activity at that time. Instead it sought to do so only after the district court granted summary judgment in favor of TD Bank on the RICO claim four months later. Coquina's motion to amend its complaint also came immediately before trial.

Because Coquina should have known by June 2011 that its closed-ended continuity theory might be untenable and that it had not pled an open-ended pattern of racketeering activity, we agree with the district court that Coquina's motion to amend, filed four months later, was unduly delayed. Coquina claims that it was surprised by the district court's summary judgment ruling because the court had treated the four years during which Rothstein's Ponzi scheme operated as the relevant time for determining continuity at the motion-to-dismiss stage. This assertion rings hollow. Coquina had notice by June 2011 that the motion-to-dismiss order's focus on the period during which Rothstein's fraud operated, instead of the period during which the alleged predicate acts of fraud against Coquina occurred, was inconsistent with case law from our and other circuits.

40

Consequently, it should have known that it could not rely on the district court's ruling in that regard.

Having carefully reviewed the parties' briefs and the relevant record, we conclude that Coquina has not shown good cause for not seeking to plead an open-ended pattern of racketeering activity sooner. We therefore find no abuse of discretion in the district court's denial of Coquina's motion to amend.[20]

### III.    CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.[21]

---

[20]    Coquina also sought in its motion to amend to bolster its RICO claim by supplementing its factual allegations relating to the benefits TD Bank derived from Rothstein's scheme. This proposed amendment would have been futile given our conclusion that the district court acted within its discretion in denying Coquina leave to add an open-ended pattern of racketeering activity because Coquina's RICO claim would still fail for failure to prove closed-ended continuity. Accordingly, the district court did not abuse its discretion in denying Coquina leave to add the additional factual allegations.

[21]    Other arguments raised by the parties are rejected without need for discussion.